UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re Application of YOLANDA FIERRO ELETA and VICTORIA-EUGENIA FIERRO ELETA for an Order to Conduct Discovery for Use in a Foreign Legal Proceeding Pursuant to 28 U.S.C. § 1782.

Civ. No. 05-22671 CIV - HUCK

MAGISTRATE JUDGE SIMONTON

### APPLICATION FOR ASSISTANCE IN AID OF A FOREIGN PROCEEDING PURSUANT TO 28 U.S.C. § 1782

Applicants Yolanda Fierro Eleta and Victoria-Eugenia Fierro Eleta are sisters involved in litigation in Spain against their brother over the division of their late father's estate, which is believed to comprise a global empire of financial, commercial, and industrial concerns estimated to be worth at least one billion dollars. They respectfully apply to this Court, pursuant to 28 U.S.C. § 1782, for an order authorizing discovery of documentary and other evidence located in this district relating to the assets of their father's estate for use in aid of the Spanish proceeding.

Although their father left a will naming his five children as equal heirs of his estate, Applicants believe that their brother, who has been running their father's business empire since their father became ill several years before his death, is withholding information from them and the Spanish court about the extent and whereabouts of the estate's assets. Among the assets that Guillermo has not declared as being part of the estate is International Finance Bank ("IFB"), a Florida corporation headquartered in Miami. The decedent is believed to have purchased IFB in February 1992, but placed 100 percent of its shares in the name of Guillermo partially for Spanish tax purposes. Applicants further

1

believe that accounts at IFB were used by certain entities controlled by Guillermo to engage in a series of sham transactions that ultimately resulted in the transfer of shares in seven Latin American match manufacturing companies that were owned or controlled by the decedent to a company controlled by Guillermo.

The discovery sought by Applicants is from IFB and four of its current or former employees who reside or work in this district, Nelson Alvarado, Myriam Nicholls-Reyes, Amadeo Lopez Castro, and Andrea Camacho. Applicants believe that these witnesses possess documents and other information that could assist them in demonstrating to the Spanish court that their father's estate is the rightful owner of, among other things, 100 percent of the shares of IFB, the shares in the seven match companies currently under Guillermo's control, the dividends earned by those shares, and accounts at IFB held in the decedent's name or for his benefit. This request for discovery is particularly pressing in light of a hearing on November 16, 2005 that the Spanish court has scheduled for the taking of inventory of the estate.

The grounds for this application are as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Applicants Yolanda Fierro Eleta and Victoria-Eugenia Fierro Eleta are two of the five children of the late Ignacio Fierro Viña. They are "interested persons," as that term is used in 28 U.S.C. § 1782, because they are heirs under their late father's will, co-administrators of his estate, and parties before the Spanish court that will take the inventory of the decedent's estate on November 16 and thereafter divide the assets among the decedent's five children.

2. This court has exclusive jurisdiction over this matter pursuant to 28 U.S.C. § 1782 as this application is for discovery from witnesses located in this district to assist the court in the Spanish proceeding in taking an inventory of the assets belonging to the decedent's estate.

3. Venue in this district is appropriate pursuant to 28 U.S.C. § 1782 because discovery is being sought from entities located in this judicial district.

## BACKGROUND

### The Decedents' Worldwide Assets

4. Mr. Fierro Viña died on June 15, 2002, in Madrid. At his death, the decedent left an international estate, which spanned at least four continents and is worth at least 1 billion dollars. See Company List (Ex. 1).[1] A documentary of the decedent's life, presented to him on his 70th birthday, described numerous business enterprises that he owned or controlled in Spain, the United States, Central America, and South America. See Excerpt stillframes from documentary produced in 1990 (Ex. 2).

5. The decedent left behind a last will and testament, designating the decedent's five children – the two Applicants here, their sisters Alejandra Fierro Eleta and Aurora Fierro Eleta, and their brother Guillermo Fierro – as heirs in equal parts of all of the decedent's assets, rights and shares. The children's inheritance rights are subject to the surviving spouse's "usufruct" of one half of the assets of the decedent's estate – a civil law concept akin to a life right in the use of a part of the estate. The surviving spouse is now in her 80s.

---

[1] A separate compendium of exhibits is being submitted with this application.

6. In 1992, the decedent suffered the first of a series of strokes that ultimately rendered him incapacitated. During the decedent's illness, Guillermo took control of his father's vast network of companies, which belong to an umbrella group known informally as the "Fierro Group," "IF Group" or the "Ignacio Fierro Group," and is now the only member of the family who has complete knowledge regarding the assets owned by the decedent. Guillermo, however, has refused to provide complete information to his sisters regarding the extent and location of these assets.

**The Ownership Structure of the Fierro Group Companies**

7. The Fierro Group entities located outside of Spain were owned mostly by offshore holding companies or by "testaferros" (frontmen and record owners), with the decedent as the beneficial owner. The ownership of those Fierro Group entities outside Spain was generally represented only by bearer shares.

8. During the long period of his father's illness, Guillermo reorganized the corporate and shareholding structure of the Fierro Group companies located outside of Spain. The end result of these restructurings was to transfer ownership or control of Fierro Group companies located outside of Spain from the decedent to Guillermo – all accomplished prior to the decedent's death. Thus, Guillermo is now claiming <u>that his father's estate contains no assets outside of Spain</u>.

**The Spanish Proceeding**

9. In June of 2003, Applicants petitioned the Court of First Instance, No. 54, in Madrid, for a judicial division of inheritance (akin to probate proceedings), requesting that the court take control of their father's estate in order to make a full inventory and valuation of all the worldwide estate assets and distribute them equally among the

4

heirs. The court granted the request and, by order of February 26, 2004, appointed all five children of the decedent co-administrators of the estate, to act by a majority of three. See February 26, 2004 Order (Ex. 3).

10.  In its ruling, the Spanish court also ordered Guillermo, who had served as de facto administrator of his father's estate and was thus "the sole holder" of information concerning the estate's assets and operations, to submit an inventory of all such assets. Id. at 3. Guillermo did not comply, and has taken the position in the Spanish proceeding that his father's estate owns no assets outside Spain. See Statement of Guillermo Fierro, dated April 22, 2004, at 5 (Ex. 4). The Spanish court has since repeated its demand to Guillermo's to furnish information about the estate. See May 12, 2004 Order (Ex. 5).

11.  Due to Guillermo's failure to comply with its requests for information, the Spanish court issued orders and writs authorizing Applicants to enter Guillermo's two Madrid offices to make an inventory of records and data at these locations. See March 2, 2005 Order, at 3 (Ex. 6). KPMG forensics experts, retained by the sisters to compile an inventory of the computerized data at these offices, documented, among others failings, a "massive deletion of files" on many of the companies' computers, much of which apparently occurred in the two weeks following the issuance of the writs by the Spanish court. See KPMG Preliminary Conclusions Memorandum, at 3, 7, 8 (Ex. 7). A subsequent order from the Spanish court noted that the possible deletion of files was not necessarily evidence of "irregular conduct." See June 16, 2005 Order, at 2 (Ex. 8).

12.  The Spanish court has expressly approved of the sisters' efforts to gather information in the United States about their father's assets. In June 2004, Guillermo

5

filed a petition with the Spanish court to enjoin his sisters from starting any action abroad to obtain evidence, arguing that such evidence would be inadmissible in Spanish court. The Spanish court denied the petition. Among other things, the Spanish court stated:

> The administrator was appointed due to the need to involve the heirs in the location of the unknown assets located abroad, of which there is circumstantial evidence consisting in various publications in American countries, in which heir DON GUILLERMO FIERRO ELETA indicates the investments and lists certain companies belonging to the I.F. group. All of the above suggests that the administrators-heirs who took steps in order to seek assets belonging to the estate in order to carry out their mission of completing the inventory, cannot be criticized.

Nov. 3, 2004 Order (Ex. 9).

13. As recently as July of this year, the Spanish court stated that any co-heir can "take actions that may benefit him or her, including without question, those that go to adding to the decedent's inheritable estate, <u>even in foreign courts</u>." See July 26 Order (emphasis added) (Ex. 10).

14. The Spanish court has scheduled a hearing for November 16, 2005 to compile a comprehensive and accurate inventory of all the assets located worldwide which should be included in the decedent's estate and thereafter divided equally among the decedent's five children. See March 2, 2005 Order (Ex. 6).

**Proceedings in the United States**

15. On June 27, 2005, Applicants filed an application pursuant to 28 U.S.C. § 1782 with the United States District Court for the Southern District of New York, seeking discovery from witnesses in that district believed to have information regarding the estate's assets. On July 27, 2005, the Court granted the application. See July 27, 2005 Order (Ex. 11). That case is currently on appeal before the Second Circuit. The district

6

court, however, has denied Applicants' motion to stay its order granting discovery pending appeal.

## EVIDENCE IN THIS DISTRICT

### Ownership of IFB

16. IFB was incorporated in Florida on June 23, 1983 under the name Westchester Bank. See Articles of Incorporation (Ex. 12). In February 1992, the bank was purchased in the name of Guillermo. Applicants believe that this was done partially for Spanish tax purposes and that the true purchaser was the decedent, who is believed to have provided all the funds for the purchase. Dunn & Bradstreet's current report on IFB states that "100% of the capital stock is owned by Guillermo Fierro." See Dunn & Bradstreet Report (Ex. 13).

17. In a series of interviews in 1992 with Moneda, a Guatemalan newspaper, Guillermo acknowledged that IFB was one of the ventures established by his father in the Americas:

> My father started the Americas venture, under the oversight of my grandfather, in the late 1940s, in 1947, after the war.
>
> . . . .
>
> The financial part began in 1958, with the bank in Venezuela, Banco Exterior, which is the oldest and largest in the group. Banks were later opened in Ecuador, Guatemala and subsequently Peru and Miami, with the name International Finance Bank IFB. Guatemala was founded in the seventies with a group of shareholders.

See Chairman of Large Business Group Visits Guatemala, Moneda, Parts I-III, dated April 22-26, 2002, Translation at 3 (Ex. 14).

18. Moreover, IFB's website, www.intlfinancebank.com, describes itself as part of the Fierro Group (aka, the IF Group, Grupo Fierro, or Grupo IF), the umbrella organization for assets owned or controlled by the decedent:

> Grupo IF, a privately held family enterprise that has been conducting business in North and South America for over 50 years, now owns International Finance Bank. Grupo IF has presence in almost every country in Latin America, and provides employment opportunities to more than 10,000 people, in 20 different industrial and financial activities.
>
> International Finance Bank along with five other institutions is part of the Grupo IF Financial Division.

See "About Us" (Ex. 15).

19. In the years following the purchase of IFB in Guillermo's name, it was generally known at the bank that the decedent was in charge. Although not officially an officer or director at IFB, the decedent made frequent visits to IFB, had an office in the premises, presided over board meetings, and had the final say on all important decisions. He was referred to generally at IFB as "El Jefe." (Londono Affidavit ¶ 4.) Notably, IFB are the initials for Ignacio Fierro Bank in the same way as the "IF" in the "IF Group" are the initials for Ignacio Fierro.

20. The decedent also selected and purchased the property at 1432 Brickell Avenue, where IFB moved to in April 1994 and established its headquarters.[2] In its March 17, 1994 edition, Miami Today published photographs of the decedent taken at the inaugural party held by IFB to celebrate the opening of its new headquarters and

---

[2] IFB stayed at 1432 Brickell Avenue until September 2000, when it moved to its present location at 888 Brickell Avenue. It now also maintains branches at 3663 SW 8th Street and 8396 SW 8th Street, Miami, Florida.

identified him as "IFB honorary chairman of the board." See Miami Today, dated March 17, 1994 (Ex. 16).

### The Use of Accounts at IFB in Sham Transactions

21. In 2000, a time when the decedent had long been incapacitated, accounts at IFB were used to effect a series of sham transactions that resulted in the transfer of shares in seven match companies in Latin America from holding companies or testaferros originally owned or controlled by the decedent to Grupo Iberoamericano de Fomento, S.A. ("GIF"), an entity controlled by Guillermo. Applicants were not aware of these transactions prior to the court-ordered examination of documents in Guillermo's Madrid offices.

22. The predecessor of GIF, Iberoamericana de Fomento, S.L., was incorporated in Spain by the decedent in 1992. See Incorporation Document of Iberoamericana de Fomento, S.L., dated September 24, 1992 (Ex. 17). In November 1996, after the decedent had already become incapacitated, the business changed its name to GIF and 99.419 percent of its shares were transferred to Seilán S.A. (Seilán), a Uruguayan corporation controlled by Guillermo. See Investment Declaration, dated Nov. 15, 1996 (Ex. 18). Enrique Rodríguez Guerrero, an officer of Seilán, received the remaining .582% of GIF's shares in his own name. In April 2000, Mr. Rodríguez Guerrero, on behalf of Seilán and himself, transferred 52 percent of GIF's shares to Guillermo and 12 percent to each of the four Fierro sisters for no consideration. See Sales Agreement, dated April 4, 2000 (Ex.19). Guillermo is believed to have given the shares to his sisters to create the appearance that they had consented to the distribution of the shares of GIF prior to their

9

father's death, and thereby remove GIF from the estate that is to be divided equally among the five siblings.

23. In October 2000, GIF, represented by Mr. Rodríguez Guerrero who had stayed on as Vice President and General Manager, entered into a contract to "purchase" shares in seven match companies located in Latin America from Keystone Investment Corp. ("Keystone"), see Stock Purchase Agreement, dated Oct. 11, 2000 (Ex. 20), a corporation incorporated in 1998 in Liberia and believed to be in the control of Guillermo, see Keystone Certificate of Incorporation, dated Feb. 19, 1998 (Ex. 21). These match companies and the percentage of the shares purchased by GIF were: (i) Fosforera Peruana S.A. in Peru ("Fopesa"), 38.07%; (ii) Fosforera Centroamerican S.A. in Guatamala ("Focasa"), 40%; (iii) Fonandes S.A. in Colombia ("Fonandes"), 20.5%; (iv) Fosforera Suramericana C.A. in Venezuela ("Fosuca"), 19.83%; (v) Fosforera Ecuatoriana, S.A. in Ecuador ("Fesa"), 45.02%; (vi) Fosforos Sud Americana S.A. in Argentina ("CGFSA"), 35.87%; and (vii) Fosforera Brasileira in Brazil ("Fobras"), 39.97%. (Ex. 20.)[3]

24. Keystone had purchased its shares in the seven match companies just five months before, in May 2000, from seven different holding companies. See Fax from

---

[3] Although the shares purchased by Keystone and thereafter sold to GIF in each of the seven match companies were less than 50 percent, Guillermo is believed to control the companies which own the remaining shares in each of those match companies. The match companies and the entities that remain significant shareholders of each of those companies are as follows: Fopesa: Lexington Finance (Comunes) (42.68%), Lexington Finance (Inversion) (24.20%), and Kingport Enterprises, S.A. (3.03%); Focasa: Proconin S.A.(59.97%); Fonandes: Euromatch Holding Corp. (55.98%) and Echoplast Investment Corp. (23.52%); Fosuca: Inversiones Penaullan (18.72%), Inversiones Candamo (19.47%), Inversiones Nalon (18.72%), and Narcea (18.72%); Fesa: Industrial Match Company (45%); CGFSA: Armatch Corp. (64.13%); and Fobras: Dantepeake Ltd. (59.95%). See List of Companies (Ex. 1).

10

G. Druet to G. Farias, dated May 10, 2000 (Ex. 22).[4] These seven holding companies, in turn, are believed to have purchased their shares in the match companies from holding companies or testaferros that held their shares for the benefit of the decedent. Indeed, three of the match companies in which Keystone acquired shares – Focasa in Guatemala, Fosuca in Venezuela, Fesa in Ecuador, and Fopesa in Peru – were featured as part of the decedent's business empire in the documentary of his life presented to the decedent on his 70th birthday. See Excerpt stillframes (Ex. 2).

25.   The total purchase price for GIF's acquisition of the shares in the seven match companies was $7.6 million, which was financed with a $3.6 million loan from Farmington S.A. ("Farmington"), a company incorporated in Uruguay. See GIF Memo re: Pending Issues (Ex. 23). The balance of $4 million was financed as deferred payments to Keystone. Id. The transfer of the loan amount from Farmington to GIF and the payments from GIF to Keystone were all made through accounts at IFB. See Memorandum to IFB from G. Farias to IFB, dated Dec. 20, 2000 (Ex. 24); Letter from E. Rodríguez Guerrero to IFB, dated Dec. 20, 2000 (Ex. 25). Indeed, documents show that GIF opened an account at IFB specifically for the purpose of receiving the loan proceeds from Farmington, see Email from G. Farias to GIF, dated Oct. 3, 2000 (Ex. 26), and the same account was used by GIF for receiving dividends from the seven match companies. See Letters from E. Rodríguez Guerrero, dated December 13, 2000 (Ex. 27). GIF is

---

[4]   The holding companies from which Keystone purchased its shares in the match companies are: Fopesa from Oakland Holding Inc. (Bahamas); Focasa from Proconin S.A. (Panama); Fonandes from Bahamas Asset Ltd. (Bahamas); Fosuca from Corporación Para Desarollos Financieros or "Codefin" (Venezuela); Fesa from Profinsa S.A. (Ecuador); CGFSA from Fosaustral Corp. (Argentina); and Fobras from Badenwiller (Brazil). (Ex. 22.)

believed to have paid its loan from Farmington and the remaining balance to Keystone gradually with proceeds it received from the match companies, either as dividends or payment for services rendered (the only two sources of funds GIF had as a holding company). See Record showing dividend payments from match companies and payments to Keystone and Farmington (Ex. 28).

26. Guillermo attempted to make it appear that the transactions that resulted in GIF's ownership of shares in the seven match companies were at arm's length. The evidence suggests, however, that in addition to GIF, Keystone and Farmington were also controlled by Guillermo, information that had not been disclosed to Applicants. Among the documents found by KPMG when it examined the computers in the Fierro Group's offices in Madrid was an unsigned letter from Guillermo to IFB, dated December 31, 2004, in which Guillermo listed GIF, Keystone, and Farmington as among the financial institutions and companies he owned or controlled "directly or indirectly, or by or for the benefit of the Fierro family shareholders who beneficially or otherwise control" those entities. See Letter from G. Fierro (unsigned) to N. Alvarado of IFB, dated Dec. 31, 2004 (Ex. 29).[5]

27. Moreover, Keystone and Farmington have common officers, some of whom are also affiliated with other Fierro Group companies. For example, George Farias, the president of International Finance Holding Corp., a New York company founded by the

---

[5] This acknowledgement of ownership or control is at odds with the position taken by GIF publicly. In a letter to Banco de España, Spain's central bank to which GIF was required by Spanish law to disclose information about its purchase of the match company shares, GIF represented that "[t]here is absolutely no relationship involving ownership between Grupo Iberoamericano de Fomento, S.A. and Keystone Investment Corp." See Letter from E. Rodríguez Guerrero to Banco de España, dated Oct. 16, 2000 (Ex. 30).

12

decedent but now owned by Guillermo, is the Vice President and a director of Keystone, and in fact represented Keystone when it sold its shares in the match companies to GIF. See E-mail from G. Farias to GIF, dated Oct. 23, 2000 (Ex. 31). Horacio Fernandez Ambielle – referred to by Mr. Farias as "our lawyer in Uruguay" – signed the documents on behalf of Farmington, the lender. See E-mail from G. Farias to GIF, dated Dec. 12, 2000 (Ex. 32). One week later, Mr. Farias' name appears again, this time as Farmington's representative in instructing IFB to transfer $3.6 million from Farmington's account to GIF's account, both of which were held at IFB. (Ex. 24.) Mr. Farias also was the recipient, on behalf of Keystone of a notification from GIF that it had transferred $3.6 million to Keystone's account at IFB in partial payment for the shares in the seven match companies. See Letter from E. Rodríguez Guerrero to G. Farias, dated Dec. 20, 2000 (Ex. 33).

28.  The evidence further suggests that GIF controlled the holding companies which sold their shares in the match companies to Keystone. On May 8, 2000, Mr. Rodríguez Guerrero of GIF wrote to each of the match companies, instructing them to transfer the stock held by a specified holding company to Keystone and to call Mr. Farias if they had any questions. See, e.g., Letter from E. Rodríguez Guerrero, dated May 8, 2000 (Ex. 34). Two days later, Guillermo Druet, the Financial Director of GIF, sent a fax to Mr. Farias, stating: "Today, we have given instructions to those in charge of the match companies involved in the transaction of reference [sale of stock to Keystone] to proceed with the stock sale." See Fax from G. Druet to G. Farias, dated May 10, 2000 (Ex. 22). Mr. Farias, who served as an officer of both Keystone and Farmington, is also believed to have been an officer of Codefin and Fosaustral, two of the holding companies from which Keystone purchased its shares in the match companies. See Draft Letter from G. Farias to

13

Focasa, dated May 2000 (Ex. 35); Letter from G. Farias to CGFSA, dated August 3, 2000 (Ex. 36).

29.  Applicants believe that IFB is in possession or control of documents that will demonstrate that Keystone and Farmington, as well as the holding companies that sold their shares in the match companies to Keystone, are owned or controlled by Guillermo and that Keystone's initial purchase of the shares in the seven match companies and subsequent sale to GIF were a sham and undertaken solely for the purpose of removing those shares from the decedent's estate.

**Dividends Belonging to the Decedent in Accounts at IFB**

30.  The decedent held at least three percent of the shares of Fesa, the match company in Ecuador, directly under his own name. See Letter from J. Fuster to E. Rodríguez Guerrero, dated Oct. 17, 2002 (Ex. 37). In October 2003, more than a year after his death, Fesa advised IFB that it had mistakenly sent dividends belonging to the decedent to the account held by GIF at IFB and that they should instead be deposited to an account held at IFB by Record Ltd. ("Record"), a Liberian company. See Letter from Fesa to IFB, dated Oct. 23, 2003 (Ex. 38). Notably, the same account held by Record at IFB was also receiving the dividends from Focasa, the Guatamalan match company, that were payable to Proconin S.A. for the 59.97 percent shares it continues to own in that match company. See E-mail from J. Sanchez to G. Farias, dated May 15, 2004 (Ex. 39). Thus, dividends belonging to the decedent and to Proconin S.A. were being transferred to the same bank account at IFB held by Record, which Applicants believe is owned or controlled by Guillermo.

14

31. Applicants believe that IFB is in possession or control of information that will allow them to ascertain the ownership of Record, and thereby trace some of the dividends from Fesa and Focasa that properly belong to the decedent's estate.

**Individual Witnesses**

32. Nelson Alvarado, Myriam Nicholls-Reyes, Amadeo Lopez Castro, and Andrea Camacho are current or former officers or employees of IFB and are believed to possess information that will assist Applicants in establishing the ownership or control of IFB, Keystone, Farmington, Record, and the seven holding companies that sold their shares in the match companies to Keystone. Mr. Alvarado is listed on IFB's website as the bank's President and CEO, and has worked at IFB in a trusted capacity for the Fierro Group for a number of years. (Ex. 15.) Mr. Castro was the owner of Westchester Bank until he sold it to the Fierro family in 1992, staying on in an executive capacity of the renamed IFB for several more years. Ms. Nicholls-Reyes has been employed with IFB since at least 1992, and is currently its Vice President of Private and Personal Banking. Finally, Ms. Camacho was the IFB employee directly involved in handling transactions involving Fierro Group entities.

## THE DISCOVERY SOUGHT BY APPLICANTS

33. Based on the foregoing, Applicants seek to obtain documents and deposition testimony relating to (i) the financing for the purchase of IFB in February 1992; (ii) minutes of meetings of the board of directors at IFB from February 1, 1992 to December 31, 1995; (iii) the decedent, including any accounts and certificates of deposits held in his name, promissory notes or personal guarantees signed by him or on his behalf, any honorary position held by the decedent at IFB, and communications to and from him;

(iv) documents relating to GIF, Keystone, Farmington, and Record, including statement of accounts at IFB, applications for the opening of accounts at IFB, authorization cards for those accounts, and communications to and from those entities; and (v) all documents relating to the transfer of funds, including dividends, from the seven match companies whose shares were acquired by GIF from Keystone to any accounts at IFB.

## CONCLUSION

For the foregoing reasons, Applicants request this Court to issue an order requiring IFB, Nelson Alvarado, Myriam Nicholls-Reyes, Amadeo Lopez Castro, and Andrea Camacho to: (i) produce documents as set forth in the accompanying proposed order within 10 days of the issuance of the order; and (ii) appear for videotaped depositions within 14 days of completing document production.

October 6, 2005
Miami, Florida

                      Respectfully submitted,

                      Coffey & Wright, L.L.P.
                      2665 South Bayshore Drive
                      Miami, Florida 33133
                      (305) 857-9797

                      By: /s/ Robert T. Wright, Jr.
                      Robert T. Wright, Jr.
                      Florida Bar No. 185525

                      *Counsel for Applicants*

Of Counsel:

Barry H. Garfinkel
Angela G. Garcia
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000

## **VERIFICATION**

I, Yolanda Fierro Eleta, hereby declare:

1.      I am the eldest daughter of the late Ignacio Fierro Viña and a co-administrator and heir of his global estate. Together with my sister, Victoria-Eugenia Fierro Eleta, I am involved in litigation against my brother, Guillermo Fierro, before the Court of First Instance, No. 54, in Madrid, Spain, regarding the division of my father's estate. Victoria and I are bringing this application pursuant to 28 U.S.C. § 1782 to obtain information in this district for use in that litigation.

2.      I have read the above application and can attest that all the facts set forth in the application are true and correct to the best of my knowledge.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 6, 2005

_____
Yolanda Fierro Eleta

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
In re Application of Yolanda Fierro Eleta and Victoria-Eugenia Fierro Eleta for an Order to Conduct Discovery Pursuant to 28 USC §1782

**DEFENDANTS**
N/A

**05-22671 CIV-HUCK**

(b) County of Residence of First Listed Plaintiff: Spain
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant: _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Robert T. Wright, Jr.
Coffey & Wright
2665 S. Bayshore Dr., PH 2B
Miami, FL 33133  (305) 857-9797

Attorneys (If Known): **MAGISTRATE JUDGE SIMONTON**
Name: 05-22671-CIV-HUCK/Simonton

(d) Check County Where Action Arose: ☑ DADE  ☐ MONROE  ☐ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☑ 3 Federal Question (U.S. Government Not a Party) — 28 USC §1782
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☑ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act |  | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine / **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
|  | ☐ 345 Marine Product Liability / ☐ 370 Other Fraud | ☐ 690 Other |  | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 190 Other Contract |  | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury / ☐ 385 Property Damage Product Liability | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☑ 890 Other Statutory Actions |
| ☐ 196 Franchise |  |  | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / **Habeas Corpus:** |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land |  / ☐ 530 General |  |  |  |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare / ☐ 535 Death Penalty |  |  | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - Employment / ☐ 540 Mandamus & Other |  |  |  |
|  |  / ☐ 550 Civil Rights |  |  | ☐ 950 Constitutionality of State Statutes |
|  | ☐ 446 Amer. w/Disabilities - Other / ☐ 555 Prison Condition |  |  |  |
|  | ☐ 440 Other Civil Rights |  |  |  |

**V. ORIGIN** (Place an "X" in One Box Only)
☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
(Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):
This is an application for an Order to conduct discovery for use in a foreign legal proceeding pursuant to 28 USC § 1782.
LENGTH OF TRIAL via N/A days estimated (for both sides to try entire case)

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ N/A
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions):
JUDGE: _____   DOCKET NUMBER: _____

DATE: Oct. 7, 2005
SIGNATURE OF ATTORNEY OF RECORD: [signature]

**FOR OFFICE USE ONLY**
RECEIPT # 928995   AMOUNT 39—   APPLYING IFP _____